**State of HAWAII, By and Through its ATTORNEY GENERAL, Plaintiff,**

v.

**FEDERAL EMERGENCY MANAGEMENT AGENCY; James Lee Witt, Director, Federal Emergency Management Agency; Lacy E. Sutter, Executive Associate Director, Federal Emergency Management Agency; Martha Z. Whetsone, Regional Director, Region IX, Federal Emergency Management Agency; Gary D. Johnson, Chief Financial Officer, Federal Emergency Management Agency; George J. Opfer, Inspector General, Federal Emergency Management Agency, Defendants.**

Civil No. 99–00490SOM/FIY.

United States District Court,
D. Hawaii.

Dec. 9, 1999.

Michael S. Vincent, Office of the Attorney General–State of Hawaii, Honolulu, HI, for plaintiff.

Caroline L. Wolyerton, United States Department of Justice, Washington, DC, for defendants.

*ORDER GRANTING PLAINTIFF'S MOTION TO SUPPLEMENT RECORD; ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT*

MOLLWAY, District Judge.

## I. INTRODUCTION.

This case arises out of the rubble of Hurricane Iniki, which devastated parts of

Hawaii in September 1992.[1] Hawaii was declared a major disaster and, as a result, received federal assistance for its cleanup. Defendant Federal Emergency Management Agency ("FEMA") assisted Plaintiff State of Hawaii ("State") by contracting with the United States Army Corps of Engineers ("ACOE") to rebuild various public schools, a hospital, a defense armory, and a community college ("Mission Assignments"). For this work, ACOE billed FEMA $12,167,381, which FEMA paid.[2] FEMA claims that the State received or should have received payment for the work done by ACOE from its insurance carrier. FEMA therefore argues that the State had a double recovery; that is, that FEMA paid for the work done by ACOE while the State received insurance payments for that same work. Accordingly, pursuant to 42 U.S.C. § 5155(c), FEMA asserts that the State should reimburse FEMA $12,167,381.[3]

The State filed this action against Defendants for declaratory and injunctive relief. The State's major claim is that FEMA is wrongfully asserting that the State owes FEMA $12,167,381. The State argues that the insurance payments it received for the Mission Assignments were $7,423,481, or $4,743,900 less than FEMA's bill of $12,167,381. The State says that section 5155(c) is therefore inapplicable.[4] Defendants moved for summary judgment on this claim, arguing that FEMA had

determined that the State owed FEMA $12,167,381 and that FEMA's determination is entitled to deference. Under the facts presented to this court on this motion, an issue of fact exists as to whether FEMA's determination was arbitrary and capricious. FEMA has not presented evidence demonstrating more than bald conclusions that the State received $12,167,381 in duplicative benefits. Accordingly, summary judgment is denied as to the duplicative benefits claim.[5]

The State also claims that FEMA violated numerous statutory and regulatory provisions. However, the State has failed to demonstrate that FEMA waived its sovereign immunity with respect to those claims. Accordingly, those claims are dismissed.

Finally, the State alleges that FEMA violated the Administrative Procedure Act's rulemaking provisions. However, the State failed to demonstrate how FEMA's actions amounted to rules. Accordingly, FEMA's rulemaking claims are dismissed.

## II. BACKGROUND FACTS.

On September 11, 1992, Hurricane Iniki hit Hawaii, causing major damage. Then–Governor John Waihee promptly asked the President of the United States to declare Hawaii a major disaster. Supp. Record at

1. As an initial matter, this court grants the State's motion to supplement the record because that motion is unopposed.

2. There is no dispute that FEMA reimbursed ACOE $12,167,381. *See* Plaintiff State of Hawaii's Concise Statement ¶ 2.

3. In relevant part, 42 U.S.C. § 5155(c) states: "A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source."

4. There is no dispute that the State received $7,423,481 in insurance benefits for the work done by ACOE. Memorandum in Support of Motion at 22; Record, Vol. 1 at 67 (letter

from Edward V. Richardson to Lacey Suiter (February 23, 1998)) ("Actual insurance proceeds in the amount of $7,423,481 were paid to the State in settlement for damages to its MALs [the work done by ACOE]"). The State admits that it owes FEMA that amount pursuant to 42 U.S.C. § 5155. However, the State contends that it does not owe FEMA the remainder of the $12,167,381 that FEMA asserts is owed, i.e., $4,743,900.

5. If the State demonstrates in a subsequent motion that FEMA's conduct was arbitrary and capricious, this court will remand the duplicative benefits issue to FEMA for further investigation, if necessary, and for further explanation of its conclusion. *See Alvarado Community Hosp. v. Shalala,* 155 F.3d 1115, 1125 (9th Cir.1998), as amended by 166 F.3d 950, 952 (9th Cir.1999).

6–8 (letter from John Waihee to the President (September 11, 1992)).[6] President George Bush declared Hawaii a major disaster and authorized federal assistance under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). Supp. Record at 9 (letter from George Bush to Wallace E. Stickney (September 12, 1992)).[7]

On or about September 12, 1992, the State and FEMA entered into the FEMA–State Agreement, in which FEMA agreed to provide assistance in the recovery effort from Hurricane Iniki. *See* Supp. Record at 10–16. That agreement made federal assistance available in accordance with the Stafford Act and applicable regulations found in Title 44, Code of Federal Regulations. The State agreed that it would ensure that insurance companies made full payment of eligible insurance benefits and that it would make "disaster victims" aware of their responsibilities to repay government assistance that was duplicated by insurance proceeds. Supp. Record at 13.

Early in the disaster response, FEMA provided "emergency protective work." This work was done by "tasking" ACOE under a "Mission Assignment Letter."[8] Declaration of Roy C. Price (November 17, 1999) ¶ 7. ACOE was awarded contracts to repair roofs, windows, ceilings, floors, and other damage to various public schools, the Samuel Mahelona Hospital, a community college, and a defense armory. *See* Record, Vol. 1 at 1 (memorandum from Dennis White to Shirley Mattingly (February 28, 1997)); Record, Vol. 1 at 55 (letter appeal from Ray Williams to Roy C. Price (December 20, 1997)). FEMA paid ACOE $7,976,501 for repairs to the public schools, $2,474,879 for repairs to the hospital, $1,600,944 for repairs to the community college, and $115,057 for repairs to the armory. Record, Vol 1 at 2. The total cost of repairs paid by FEMA to ACOE was thus $12,167,381. *Id.*

The State received $45,722,627 as a total, lump-sum, insurance settlement arising out of the damage caused by Hurricane Iniki.[9] Record, Vol. 4 at 2–4. Of this amount, the State argues that $7,423,481, rather than $12,167,381, is attributable to work done by ACOE as follows:[10]

| Site | Insurance Proceeds |
| --- | --- |
| Hanalei Elementary | $21,594 |
| Kilauea Elementary | $151,341 |
| King Kaumualii | $77,395 |
| Kapaa Elementary | $559,604 |
| Anahola | $0 |
| Wilcox Elementary | $88,942 |
| Kalaheo Elementary | $97,306 |
| Koloa | $282,854 |
| Waimea Canyon | $723,926 |
| Kekaha | $53,675 |

6. All parties have stipulated to the authenticity of the Administrative Record ("Record") and the supplemental record ("Supp.Record").

7. President Bush later waived the cost-sharing provisions of the Stafford Act, agreeing that FEMA could reimburse 100% of eligible public assistance exceeding $10 per capita, or $2,837,000. Supp. Record at 19–20 (letter from George Bush to Wallace E. Stickney (September 18, 1992)); Supp. Record at 22 (letter from A. Roy Kite to Major General Richardson (September 25, 1992)).

8. A "mission assignment" is a work order issued by FEMA to another federal department or agency directing completion of a specific task in anticipation of, or in response to, a presidential declaration of a major disaster or emergency. The federal department or agency performing the work is reimbursed directly by FEMA for all eligible costs incurred while performing that task. *See* Record, Vol. 13 at 172.

9. The State claims it received $42,122,719 as the total insurance payment. *See* Declaration of John T. Takamune (November 16, 1999) ¶ 10; Record, Vol. 1 at 104; Record Vol. 4 at 163; Record Vol. 6 at 36; Record Vol. 7 at 370; Record Vol. 11 at 388. However, that amount appears to be insurance payments for the real property and personal property damage only ($38,716,367 + $3,406,352 = $42,122,719). *See* Record, Vol. 4 at 2. It does not appear to include insurance payments for incurred costs ($3,605,796) or for vehicles ($244,112). Nor does it take into account the State's $250,000 deductible. *Id.*

10. Neither FEMA nor ACOE has provided a detailed breakdown of how $12,167,381 was spent.

| Site | Insurance Proceeds |
|------|-------------------:|
| Waimea High | $1,144,898 |
| Eleele Elementary | $131,330 |
| Kapaa High | $892,702 |
| Kauai High | $874,377 |
| Sam Mahelona Hospital | $1,349,960 |
| Kauai Community College | $973,576 |
| **Total =** | **$7,423,481** |

Takemune Decl. ¶ 14; Record, Vol. 1 at 251.

Between February and December 1996, the federal Office of Inspector General conducted an audit of the State's insurance coverage for Hurricane Iniki repairs. Declaration of Jack Lankford (October 7, 1999) ¶ 3. The auditors determined that the State maintained insurance for its public buildings with coverage up to $150,000,000 and that the State had settled its claims for damage caused by Hurricane Iniki on a "loss-estimate basis" for $45,722,627. Record, Vol. 3 at 322; Record Vol. 4, at 2–4; Record, Vol. 13 at 172. The auditors concluded that the State had not reimbursed FEMA for the cost of repairs made by ACOE and funded by FEMA ($12,167,381), "even though the repairs were covered by insurance and the State received insurance proceeds for the repairs." Record, Vol. 1 at 1.

As a result of the audit, on April 22, 1997, FEMA concluded that the State owed FEMA $12,167,381 because the State had or should have received insurance payments for $12,167,381 worth of work paid for by FEMA. Record, Vol. 13 at 172 (letter from William L. Carwile, III, to Roy Price (April 22, 1997)). The State was notified that, if it disagreed with FEMA's determination, the State could submit an appeal to the Regional Director within sixty days, pursuant to 44 C.F.R. § 206.206. *Id.*

The State appealed FEMA's determination of duplicative benefits on September 19, 1997.[11] *See* Record, Vol. 1 at 30–53. FEMA denied this appeal on December 20, 1997. Record, Vol. 1 at 54–63.

On February 23, 1998, the State took a further administrative appeal from FEMA's order dated December 20, 1997. Record, Vol. 1 at 64–78. This second appeal was also denied by FEMA on March 6, 1999. Record, Vol. 1 at 537–40. That denial stated that it was the "final decision on the matter."[12] Record, Vol. 1 at 537.

### III. STANDARD OF REVIEW.

FEMA bases its motion to dismiss or in the alternative for summary judgment on Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure.

#### A. Rule 12(b)(1) Standard.

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may either attack the allegations of the complaint as insufficient to confer upon the court subject matter jurisdiction, or may attack the existence of subject matter jurisdiction in fact.[13] *Thornhill Publ'g Co., Inc. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir.1979). When the motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favor-

---

**11.** The State said at the hearing on the present motion that it had received extensions for filing its appeal.

**12.** Before FEMA issued its decision on the second appeal, but after the first appeal, FEMA's Western Territorial Closeout Team ("WTCT") issued a report stating that the insurance carrier had assigned a value of $7.4 million to the work ACOE was believed to have done. WTCT concluded that "FEMA should accept $7.4 million as the value of the duplicated USACE [ACOE] work, and revise the bill of collection accordingly." Record, Vol. 1 at 250. At the hearing on the motion, FEMA said that the second appeal was not limited to evidence considered on the first appeal, citing this court to 44 C.F.R. § 206.206(d).

**13.** A motion based on sovereign immunity grounds is properly analyzed under Rule 12(b)(1). *See Proctor v. United States,* 781 F.2d 752, 753 (9th Cir.), *cert. denied,* 476 U.S. 1183, 106 S.Ct. 2918, 91 L.Ed.2d 546 (1986).

able to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996). When the motion to dismiss is a factual attack on subject matter jurisdiction, however, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the existence of subject matter jurisdiction in fact. *Thornhill,* 594 F.2d at 733.

■ Plaintiffs have the burden of proving that jurisdiction does in fact exist. *Thornhill,* 594 F.2d at 733. Conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss. *Rosenbaum v. Syntex Corp.,* 95 F.3d 922, 926 (9th Cir.1996).

### B. *Rule 12(b)(6) Standard.*

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal upon the "failure to state a claim upon which relief can be granted." Review is limited to the contents of the complaint. *Campanelli v. Bockrath,* 100 F.3d 1476, 1479 (9th Cir. 1996); *Allarcom Pay Television, Ltd. v. General Instrument Corp.,* 69 F.3d 381, 385 (9th Cir.1995); *Argabright v. United States,* 35 F.3d 472, 474 (9th Cir.1994).

For a motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Federation of African Amer. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir.1996). Conclusory allegations of law and unwarranted inferences, however, are insufficient to defeat a motion to dismiss. *Rosenbaum v. Syntex Corp.,* 95 F.3d 922, 926 (9th Cir. 1996).

Dismissal may be based on either: (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988) (citing *Robertson v. Dean Witter Reynolds,* 749 F.2d 530, 533–34 (9th Cir.1984)). A motion to dismiss may also be granted if

an affirmative defense or other bar to relief is apparent from the face of the complaint, such as absolute immunity or the statute of limitations. 2A J. Moore, W. Taggart & J. Wicker, *Moore's Federal Practice,* ¶ 12.07 at 12–68 to 12–69 (2d ed. 1991 & Supp. 1191–92) (citing *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

If matters outside the pleadings are considered, the motion to dismiss is treated as one for summary judgment. *See Keams v. Tempe Tech. Inst., Inc.,* 110 F.3d 44, 46 (9th Cir.1997); *Anderson v. Angelone,* 86 F.3d 932, 934 (9th Cir.1996).

### C. *Summary Judgment Standard.*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered when

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the initial burden of "identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The movant must be able to show "the absence of a material and triable issue of fact," *Richards v. Neilsen Freight Lines,* 810 F.2d 898, 902 (9th Cir.1987), although it need not necessarily advance affidavits or similar materials to negate the existence of an issue on which the nonmoving party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

If the moving party meets its burden, then the opposing party may not defeat a motion for summary judgment in the absence of any significant probative evidence

tending to support its legal theory. *Commodity Futures Trading Comm'n v. Savage,* 611 F.2d 270, 282 (9th Cir.1979). The opposing party cannot stand on its pleadings, nor can it simply assert that it will be able to discredit the movant's evidence at trial. *See T.W. Elec.,* 809 F.2d at 630. Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979). Moreover, if the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. *California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

The standard for a grant of summary judgment mirrors the standard governing the grant of a directed verdict. *See Eisenberg v. Insurance Co. of North America,* 815 F.2d 1285, 1289 (9th Cir.1987)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, the question is whether "reasonable minds could differ as to the import of the evidence." *Eisenberg,* 815 F.2d at 1289.

However, when "direct evidence" produced by the moving party conflicts with "direct evidence" produced by the party opposing summary judgment, "the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact." *T.W. Elec.,* 809 F.2d at 631.

Also, inferences from the facts must be drawn in the light most favorable to the nonmoving party. *Id.* These inferences may be drawn both from underlying facts that are not in dispute, as well as from disputed facts that the judge is required to resolve in favor of the nonmoving party. *Id.*

## IV. *ANALYSIS.*

### A. *Duplicative Benefits.*

■ The bulk of FEMA's motion seeks summary judgment on the State's duplicative benefits claim.[14] FEMA contends that its determination that the State received duplicative benefits and therefore owes FEMA $12,167,381 is entitled to deference.[15] FEMA argues that, pursuant to 5 U.S.C. § 706(2), its determination that the work done by ACOE was fully covered by insurance is reviewed under the arbitrary and capricious standard.[16] This court agrees that the arbitrary and capricious standard applies to FEMA's findings of fact; however, FEMA's conclusions of law are reviewed de novo, giving deference to FEMA's "reasonable construction" of the statutes and regulations. *See Potato Sales Co. v. Dep't of Agric.,* 92 F.3d 800, 803 (9th Cir.1996).

■ The scope of review under the arbitrary and capricious standard is narrow, and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Assoc. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the

**14.** Because matters outside the pleadings were considered, Defendants' motion to dismiss the State's duplicative benefits claim under section 12(b)(6) is treated as one for summary judgment. *See Kearns,* 110 F.3d at 46; *Anderson,* 86 F.3d at 934.

**15.** "FEMA agrees that its determination of the State's liability for duplicative benefits is

reviewable under the APA." Memorandum in Support of Motion at 27 n. 17.

**16.** Section 706(2) states that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

facts found and the choice made. *Id.* In reviewing an agency's explanation, this court considers whether the decision was based on a consideration of relevant factors and whether there has been a clear error in judgment. *Id.* An agency rule would be arbitrary and capricious if the agency relied on factors that Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that ran counter to the evidence before the agency, or rendered an explanation so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*

▉ Whether the State must reimburse FEMA $12,167,381 as opposed to $7,423,481 depends on the interpretation of 42 U.S.C. § 5155. FEMA determined that, under section 5155(c), the State must reimburse FEMA for insurance money "available" to the State. FEMA rejected the State's argument that, under section 5155(a), the State only has to reimburse FEMA for insurance money actually received, i.e., $7,423,481.[17] FEMA's determination that section 5155(c) applies to this case is a conclusion of law that this court reviews de novo. *Potato*, 92 F.3d at 803. This court agrees with FEMA's determination that section 5155(c) applies.

▉ Section 5155(a) states that the "President ... shall assure that no such person, business concern, or other entity will receive such assistance with respect to

any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source." 42 U.S.C. § 5155(a). The plain meaning of section 5155(a) is that the President shall prevent persons, businesses, and other entities from receiving FEMA benefits when those persons, businesses and other entities have already received financial assistance from another source, such as insurance.[18] This interpretation is in accord with a committee report on a similar version of the act that was not enacted:

> A recent study performed by FEMA indicates that in some cases, disaster assistance provided what should have been covered by an applicant's insurance. It appears that insurance companies are not paying claims in a timely manner, or that applicants are not filing claims for items which should have been covered. The new feature of section 312(a) gives FEMA and other disaster assistance agencies and organizations a strong new mandate to provide disaster assistance only when insurance proceeds to which a person is entitled have been considered and the need for supplemental assistance remains.

S.Rep. No. 100–524 at 13 (1988) (interpreting section 312(a) of Senate Bill No. 2380, which was not the bill enacted into law, but was similarly worded).[19] The State's argu-

---

**17.** The State additionally argues that, under the FEMA–State agreement, the State is not obligated to reimburse all funds available, but instead only funds received. *See* Supp. Record at 10–16. The State argues that, if FEMA was going to require the State to reimburse funds available, the agreement should have stated that. The State's argument is not persuasive because the agreement made federal assistance available in accordance with the Stafford Act and applicable regulations found in Title 44, Code of Federal Regulations. Supp. Record at 13.

**18.** When the plain meaning of a statutory provision is unambiguous, that meaning is controlling. To determine the plain meaning of a statutory provision, this court examines not only the specific provision at issue, but also the structure of the statute as a whole,

including its object and policy. If ambiguity exists, this court may use legislative history as an aid to interpretation. *Children's Hosp. and Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir.1999).

**19.** Section 312(a) of Senate Bill 2380 states in pertinent part:

> Agencies or other organizations providing Federal assistance for needs for losses resulting from a major disaster or emergency shall assure that no person, business concern, or other entity receives any such Federal assistance if said person, business concern, or entity receives or is entitled to receive benefits for the same purposes from insurance or any other Federal or non-Federal source: Provided, That nothing in this section shall prohibit the provision of Fed-

ment that it only owes FEMA $7,423,481 because that is all of the insurance money it "received" is therefore not persuasive.[20]

 Unlike section 5155(a), which speaks of a general prohibition against receiving federal financial assistance after one receives insurance benefits, section 5155(c) goes to the recovery of duplicative benefits. Section 5155(c) states that a "person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source." The plain meaning of section 5155(c) is that the State must reimburse FEMA to the extent FEMA's assistance duplicated benefits "available" for the same purpose from another source, including insurance benefits. This interpretation is also in accord with the committee reports on the Disaster Relief Act Amendments of 1988, which note that section 5155 "seeks to prevent an applicant from receiving Federal disaster assistance where insurance did, or should have, provided benefits for the same purpose." S.Rep. No. 100–524 at 13 (1988) (interpret-

ing section 312(a) of Senate Bill No. 2380, which was not the precise bill enacted into law).[21]

The issue is therefore whether insurance benefits were "available" to the State for the work done by ACOE. Here, FEMA determined that insurance coverage existed for the work done by ACOE. *See* Record, Vol. 1 at 2 (although noting that it was not possible to identify the insurance payment that applied to the repairs done by ACOE, FEMA concluded that "the work done by the Corps [ACOE] was fully covered by insurance"). This determination is a finding of fact that this court reviews under the arbitrary and capricious standard. 5 U.S.C. § 707(2); *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. 2856.

The State argues that FEMA's finding was arbitrary and capricious because FEMA offered an explanation for its decision that ran counter to the evidence before it. That is, the State says FEMA concluded that the State owed FEMA $12,167,381—the amount billed to FEMA by ACOE—without evidence that the State had actually received or was entitled to receive duplicative insurance benefits.[22]

---

eral assistance to a person, business concern, or other entity who is or may be entitled to receive benefits for the same purposes from insurance ... when any such applicant for Federal assistance has not received such other benefits by the time of application for Federal assistance, so long as the applicant for Federal assistance agrees as a condition of receipt of Federal assistance to repay duplicative assistance from insurance ....

S. Rep. No. 100–524 at 41 (1988). Although an examination of the legislative history was not necessary because section 5155(a) is unambiguous, the legislative history provides support for FEMA's reading of section 5155(a), and examination of the legislative history was proper given the importance of this issue. *See Children's Hosp.*, 188 F.3d at 1097.

**20.** Even assuming that this court were to apply section 5155(a), section 5155(c) would nevertheless have to be addressed.

**21.** The State claims that, in "a belated attempt to justify its untenable decision, FEMA has amended the arguably applicable federal regulations." Opp. at 2. The State argues

that this amendment went into effect approximately two months ago, and therefore cannot be used to justify FEMA's decisions from 1992. This argument is misleading. Although an amendment went into effect on October 1, 1999, that amendment had to do with what factors FEMA employs to evaluate the need for assistance before it is given, not with what factors are considered in trying to collect duplicative benefits. *See* 44 C.F.R. § 206.48 (1999) ("We consider the amount of insurance coverage that is in force or should have been in force as required by law and regulation at the time of the disaster, and reduce the amount of anticipated assistance by that amount"). Moreover, FEMA does not rely on section 206.48, but instead relies on section 5155(c).

**22.** In its papers, FEMA claims its determination was based on the audit report and an analysis by the TAC Team (a team of private technical assistance contractors retained by FEMA's Region IX office). The audit report, however, merely concluded that "[o]ur analysis of the repairs showed that the work done by the Corps [ACOE] was fully covered by insurance." Record, Vol. 1 at 2. The audit

In support, the State cites FEMA's Western Territorial Closeout Team ("WTCT") report, which stated that the State's insurance carrier attached a value of $7.4 million to the work believed to have been done by ACOE. WTCT concluded that "FEMA should accept $7.4 million as the value of the duplicated USACE [ACOE] work and revise the bill of collection accordingly." Record, Vol. 1 at 250. The State argues that FEMA ignored the WTCT report in concluding that the State owes FEMA $12,167,381.

Although FEMA's finding that the State had received or was entitled to receive $12,167,381 in insurance proceeds for ACOE's work is entitled to deference, the court is concerned that the record before it allows the conclusion that FEMA's determination may have been arbitrary and capricious. FEMA must at least demonstrate that its finding was supported by an adequate explanation before the court will

defer to FEMA. FEMA cites to the following pages of the record as demonstrating that the $4,743,900 at issue was actually "available" to the State from its insurance carrier: Record, Vol. 16 at 311 and 316; Record, Vol. 1 at 459, 239, and 247. None of these citations provides an explanation for FEMA's decision.[23]

The court is not saying that it will reject an administrative ruling unless an agency lays out in lengthy detail the entire process by which it reached its conclusion. Rather, the court requires *some* evidence that the agency, besides acknowledging and discussing disputed issues, had some basis that was not arbitrary and capricious for resolving those disputes. Here, FEMA has pointed the court only to agency acknowledgments of disputes and to conclusions, with no evidence that the conclusions had a reasonable basis. At the very least, *some* indication of the basis for the conclusions is required. Otherwise,

---

did not substantiate its conclusion with any facts. The TAC Team analysis used a sampling of ten school buildings to determine that "almost 99%" of ACOE's work was included in the insurance payment. Record, Vol. 1 at 4. The TAC Team analysis again determined that all of ACOE's work was covered by insurance because "coverage included replacement cost or actual cost to repair with additional coverage for code upgrades." Record, Vol. 1 at 7. Again, FEMA has not demonstrated a substantiated basis for this conclusion.

**23.** The document beginning at Vol. 16 at 311 is a memorandum from Lacy Suiter to Richard A. Buck. That memorandum merely concludes that the audit "gives validity to the fact that[,] from a global perspective, the State received sufficient funds to cover the repairs to the facilities." The audit was based on bald conclusions. Accordingly, this document does not demonstrate that its finding was supported by an adequate explanation.

The document beginning at Vol. 16 at 316 is a memorandum regarding audit sampling techniques. It does not show how and why FEMA came to its conclusion that the State owed it $12,167,381.

The document beginning at Vol. 1 at 459 is a list of meetings and telephone conferences

held. It appears to be from FEMA's Office of General Counsel. This document indicates that the duplicative benefits issue was being discussed; however it does not explain how FEMA determined the amount of duplicative benefits.

The document beginning at Vol. 1 at 239 is a draft memorandum regarding the State's second appeal. Besides being merely a draft, its conclusion was that there "are arguments, counter-arguments, and counter-counter arguments with no exact correct answer" regarding whether approximately $12.1 million or $7.4 million was received by the State in duplicative benefits. Vol. 1 at 245. Again, this document does not explain FEMA's decision; it refers only to FEMA's inability to support its determination with specific facts.

The document at Vol. 1 at 247 is a memorandum regarding the second appeal analysis by WTCT. The author of the memorandum, George Markham, states that he agrees with the WTCT report, which supports a "compromise in the amount of $7,423,481." The memorandum concludes that there are arguments as to why any figure would not be supported by the facts and that "a detailed line item comparison of all invoices will lead to the same conclusion." *Id.* The memorandum does not demonstrate that FEMA's find-

the court cannot tell, for example, whether FEMA is basing its decision on reasons that run counter to the evidence. FEMA may well have had more than adequate basis for its determination, but that basis has yet to be identified for this court.[24]

The State notes that insurance may not have covered all the work done. For that reason, the State chose to settle its claim for $45,722,627. *See id.* (stating that the State Comptroller "pointed out that the advantage of the loss estimate basis is that there is no accountability to the insurer"); Price Decl. ¶ 12 ("Insurance adjusters use the lowest cost method of repair instead of an expedited repair, which costs much more. Adjusters also differ on depreciation allowances and cost for code upgrades, building contents, loss of use of facility, etc.").

 Given the matters presented to the court, FEMA's motion for summary judgment is denied as to the State's claims concerning the alleged duplicative insurance benefits. An issue of fact exists as to whether FEMA's determination of duplicative benefits available to the State was arbitrary and capricious. As "available" insurance does not necessarily equal the policy limits of the State's insurance policy, the insurance "available" to the State, taking the policy's exclusions into account, may well have been less than the amount FEMA paid to ACOE. If indeed, as FEMA concluded, the "available" insurance was the amount paid to ACOE, FEMA should not be having the difficulty it is having showing the basis for FEMA's conclusion.

ing was supported by an adequate explanation.

**24.** The Administrative Record and the Supplemental Record consisted of approximately four feet of documents. The court placed the burden on FEMA of identifying the specific pages in the record supporting FEMA's determination.

### B. *Sovereign Immunity and Exhaustion.*

FEMA argues that sovereign immunity and the State's failure to exhaust administrative remedies bar the State's claims under the Stafford Act, the Anti–Deficiency Act, and the Inspector General Act.[25] Defendants therefore move to dismiss these claims pursuant to Rule 12(b)(1). Because the State's claims are not before this court pursuant to the APA's procedures for judicial review of agency decisions, and because the State has not demonstrated that the United States waived its immunity for those claims, sovereign immunity bars those claims. *Graham v. Federal Emergency Management Agency,* 149 F.3d 997, 1005 (9th Cir.1998) (a party bringing an action against the United States bears the burden of demonstrating an unequivocal waiver of immunity). Similarly, the doctrine of exhaustion of administrative remedies also bars these claims. *Young v. Reno,* 114 F.3d 879, 881–82 (9th Cir.1997) (stating that, with certain exceptions, the doctrine of exhaustion of administrative remedies bars judicial review of an adverse administrative decision until the party first pursues all possible relief within the agency).

The State argues that the United States waived its sovereign immunity for the State's statutory and regulatory claims under 5 U.S.C. § 702. That argument is not persuasive. Section 702 of the APA waives the sovereign immunity of the federal government for a plaintiff aggrieved by agency action to seek judicial review of final agency decisions. *Dunn McCampbell Royalty Interest, Inc. v. National Park Serv.,* 964 F.Supp. 1125, 1131 (S.D.Tex. 1995), *aff'd,* 112 F.3d 1283 (5th Cir.1997).

**25.** FEMA does not assert that sovereign immunity bars the State's claims under the APA for rulemaking violations. Nor does FEMA assert that sovereign immunity bars the State's duplicative benefits claims. *See* Memorandum in Support of Motion at 27 n. 17 ("FEMA agrees that its determination of the State's liability for duplicative benefits is reviewable under the APA").

Under section 702, a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Section 702 contains two separate requirements.

 First, the entity claiming a right to sue must identify some "agency action" that affects it in a specified fashion; it is entitled to judicial review only of that action.[26] *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). When review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the agency action in question must be "final agency action." *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review"); *see also Lujan,* 497 U.S. at 882, 110 S.Ct. 3177; *Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) ("Any person 'adversely affected or aggrieved' by agency action; *see* § 702, including a 'failure to act,' is entitled to 'judicial review thereof,' as long as the action is a 'final agency action for which there is no other adequate remedy in a court'"); *Ecology Center, Inc. v. United States Forest Serv.,* 192 F.3d 922, 924 (9th Cir.1999) ("As codified in the APA, a person suffering a legal wrong because of agency action, or adversely affected by agency action within the meaning of a relevant statute, is entitled to judicial review. The agency action must be a final agency action for which there is not any

other adequate court remedy, or be reviewable by statute") (internal citations omitted).

 Second, the party seeking review under section 702 must show that he has suffered legal wrong because of the challenged agency action, or is adversely affected or aggrieved by that action within the meaning of a relevant statute. *Lujan,* 497 U.S. at 883, 110 S.Ct. 3177.

 Section 702 therefore applies to "judicial review" of final agency action. It is not a general waiver of the United States' immunity for claims against federal agencies, and it does not eliminate the exhaustion requirement. Accordingly, the federal government's sovereign immunity and the doctrine of exhaustion of administrative remedies bar the State's claims under the Stafford Act, the Anti–Deficiency Act, and the Office of Inspector General Act.

#### C. *Rulemaking.*

 Under 5 U.S.C. § 553, agencies must give the public notice and an opportunity to comment on proposed rules, although this requirement does not apply to interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice.[27] 5 U.S.C. § 553; *Flagstaff Med. Ctr., Inc. v. Sullivan,* 962 F.2d 879, 885–86 (9th Cir.1992).

 The State contends that FEMA violated the rulemaking provisions of the APA. The State alleges that the following were rules that were made without compliance with the rulemaking process: 1) FEMA determined that the State owes FEMA insurance proceeds "avail-

---

**26.** The meaning of "agency action" for purposes of section 702 is set forth in 5 U.S.C. § 551(13), *see* 5 U.S.C. § 701(b)(2) ("For the purpose of this chapter ... 'agency action' ha[s] the meanin[g] given ... by section 551 of this title."). Section 551 defines the term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

**27.** The determination of whether a rule is substantive or interpretive focuses on the rule itself and its impact on agency decisionmaking, rather than its impact on the public. *Flagstaff Med. Ctr.,* 962 F.2d at 886. Interpretive rules are those that merely clarify or explain existing laws or regulations. Substantive rules include those that work a change in law or policy. *Id.*

able" to the State for Hurricane Iniki; 2) FEMA failed to prepare damage survey reports as required; 3) FEMA paid ACOE $12,167,381 when ACOE overbilled FEMA and when ACOE did not provide a final accounting to FEMA demonstrating how that money had been spent; 4) FEMA prematurely referred the collection of the $12,167,381 debt to its collection officer; and 5) the Office of Inspector General improperly participated in the State's appeal of the duplicative benefits issue.

Defendants moved to dismiss the State's rulemaking claims under Rule 12(b)(6). As to the first claim regarding funds available, FEMA was merely interpreting section 5155(c). Accordingly, section 553 does not apply. *Flagstaff,* 962 F.2d at 886. With respect to the State's remaining rulemaking claims, none of the alleged acts amounts to a "rule" as defined by 5 U.S.C. § 551, which states:

> "rule" means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing.

5 U.S.C. § 551(4). Accordingly, the State's rulemaking claims fail.

## V. *CONCLUSION.*

The State's motion to supplement the administrative record is granted. Defendants' motion to dismiss or in the alternative for summary judgment is granted in part and denied in part. Summary judgment is denied with respect to the State's duplicative benefits claim because FEMA has not demonstrated that its decision was based on evidence in the record. This denial is without prejudice to FEMA's

right to present this issue again, based on such other evidence as it may be able to identify. The State's statutory and regulatory claims are dismissed based on sovereign immunity grounds and the doctrine of exhaustion of administrative remedies. Finally, the State's rulemaking claims are dismissed because they are not "rules" that implicate the APA's rulemaking procedures.

IT IS SO ORDERED.