**STATE OF HAWAII, by and through Its ATTORNEY GENERAL, Plaintiff–Appellant,**

v.

**FEDERAL EMERGENCY MANAGEMENT AGENCY; Joe M. Allbaugh,\* Director, FEMA; Lacy E. Suiter, Executive Associate Director, Response and Recovery Directorate, FEMA; Karen Armes, Regional Director, Region IX, FEMA;\*\* Patricia A. English, Acting Chief Financial Officer, FEMA;\*\*\* George J. Opfer, Inspector General, FEMA, Defendants–Appellees.**

No. 00–15895.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 5, 2001.

Filed June 26, 2002.

---

\* Joe M. Allbaugh is substituted for his predecessor, James Lee Witt, as Director of the Federal Emergency Management Agency. Fed. R.App. P. 43(c)(2).

\*\* Karen Armes is substituted for her predecessor, Martha E. Whetstone. Fed. R.App. P. 43(c)(2).

\*\*\* Patricia A. English is substituted for her predecessor, Gary D. Johnson. Fed. R.App. P. 43(c)(2).

Dorothy D. Sellers, with whom Michael S. Vincent was on the briefs, Office of the Attorney General, State of Hawaii, Honolulu, HI, for plaintiff-appellant.

Caroline Lewis Wolverton, United States Department of Justice, Civil Division, Washington, DC, for defendants-appellees.

Before: THOMPSON, O'SCANNLAIN and BERZON, Circuit Judges.

BERZON, Circuit Judge:

Hurricane Iniki stormed over the Hawaiian island of Kauai a decade ago, but a dispute it left behind continues. The largest disaster ever to hit the state of Hawaii ("Hawaii"), the 1992 hurricane caused an estimated $2.6 billion in damage.

The Federal Emergency Management Agency ("FEMA" or "the Agency"), the agency of the federal government that provides dollars to communities afflicted by floods, earthquakes, fires, and hurricanes, provided substantial assistance to the state. Hawaii's insurers, in a settlement with the state, did so as well. For the most part, the federal Agency and the private insurance companies distributed their dollars to different projects. But in the case of the repair of sixteen state facilities, including institutions such as the Hanalei Elementary School and the Sam Mahelona Hospital ("the disputed repairs"), the aid overlapped.

Under federal disaster relief law, the federal government is essentially a last resort provider of disaster relief. Disaster victims cannot retain FEMA funds when another party provides the same relief. Pursuant to the preclusion of duplicative relief, Hawaii reimbursed FEMA for all the insurance proceeds from its settlement that it allocated to the damage to the sixteen facilities.

FEMA, however, spent more on the disputed repairs than Hawaii had allocated from its settlement for them. FEMA does

not impugn the propriety of Hawaii's decision to enter into an overall settlement with its insurers or the terms of the settlement. Nonetheless, FEMA is not satisfied with the amount of Hawaii's reimbursement. Under Hawaii's insurance policies, FEMA maintains, the state *could* have received the full amount that FEMA spent on the disputed repairs. Federal law requires a disaster victim to reimburse FEMA for all duplicative assistance "available" to it. 42 U.S.C. § 5155(c).[1] Additional insurance benefits that the state could have obtained had it not settled for less—reasonable though the decision to settle was—were "available," FEMA argues; therefore an equivalent amount of money must be paid to the Agency.

The central question in this case, consequently, is whether a recipient of FEMA assistance must repay FEMA for funds above and beyond the amount it received as the result of a reasonable settlement with an alternative source of relief funds.

## I. Background

The day after Hurricane Iniki devastated the Hawaiian island Kauai in 1992, former President George Bush declared the state a disaster area and authorized FEMA to provide disaster relief. As part of its response, FEMA directed the United States Army Corps of Engineers ("ACOE") to provide assistance. The ACOE in turn contracted with area construction companies to make the disputed repairs, completing them in early 1993. FEMA eventually paid the ACOE $12.1 million[2] for the disputed repairs.[3]

When Iniki struck, Hawaii had several insurance policies. The state's primary insurance policy had a $10 million per occurrence limit and a $250,000 deductible. Its excess coverage policy had a $40 million per occurrence limit. These two policies were subject to the same terms and conditions.

In May 1994, Hawaii settled with these two insurers for $42.7 million. Dubbed a "global settlement," the agreements encompassed all of the damaged property covered by the insurers, including the sixteen facilities at the fulcrum of this dispute. The amount of the settlement was based on surveys conducted by two independent firms of insurance adjusters. The survey reports quantified every item of damage and estimated the cost of repair for each. Of the total settlement amount, Hawaii attributed $7.4 million to work performed by the ACOE at the sixteen sites.[4] As noted above, FEMA ultimately reimbursed the ACOE $12.1 million for these

---

1. Section 5155(c) states:

 A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source. The agency which provided the duplicative assistance shall collect such duplicative assistance from the recipient in accordance with chapter 37 of Title 31, relating to debt collection, when the head of such agency considers it to be in the best interest of the Federal Government.

 Unless otherwise noted, all statutory references in this opinion are to statutes that appear in Chapter 42 of the United States Code.

2. For the sake of readability, dollar figures are rounded to the nearest $100,000.

3. Hawaii argues, without contradiction from FEMA, that the last reimbursement request submitted to FEMA by the ACOE for the disputed repairs came in 1995, after the state entered into the insurance settlement.

4. When Hawaii first appealed to FEMA, it stated that it had attributed $5.4 million to the work completed by the ACOE. In its second administrative appeal, Hawaii changed this figure to $7.4 million, explaining that the insurance adjuster had omitted two schools, the armory, and the architectural and engineering costs for the hospital and the community college. The district court held that FEMA's determination that Hawaii actually received $12.1 million for the disputed repairs was arbitrary and capricious. *Hawaii v.*

disputed repairs. The difference, $4.7 million, is the amount in dispute in this litigation.

In the settlement negotiations, Hawaii's private insurers suggested that Hawaii select between two basic approaches for determining the amount it would receive: (1) a cash out or loss estimate basis or (2) an actual replacement cost basis. To assist state officials in making a decision that would "provide the best result in terms of restoring the buildings in the most efficient and timely manner," the Hawaii comptroller described the two options as follows:

> The advantage of cashing-out is that there is no accountability to the insurer. The disadvantage is that there is no recourse against the insurer, such as when construction bids exceed the loss estimates. The advantage of settling on [sic] actual cost basis is that the final replacement costs will be paid by insurance. The disadvantage is the slow pace that often result [sic] when the insurer is involved with the development of the scope of the work, overseeing the bidding process, and resolving insurance, cost and construction issues, such as when the replacement or repair is modified from the original building.

In a settlement that FEMA has never challenged as unreasonable, Hawaii decided to "cash-out," for $42.7 million.[5]

Although invited, FEMA chose not to participate in the settlement negotiations between Hawaii and its insurers, because "it had no role to play." Nor did FEMA provide detailed cost information for the disputed repairs to either Hawaii or its insurers. The ACOE continued to bill FEMA for the disputed repairs after Hawaii settled with its insurers. Even today, the available ACOE billing statements do not include detailed breakdowns of the actual costs of the repairs. As FEMA held in its final administrative decision, "detailed breakouts of actual costs for the majority" of the ACOE's disputed repairs "do not exist."

Eight months after Hawaii and its insurers settled, FEMA informed Hawaii that its Office of Inspector General was conducting an audit of the insurance reimbursement. The Inspector General concluded that it was not possible to determine how much of the $42.7 million insurance settlement that Hawaii received applied to the repairs done by the ACOE. The audit report nonetheless concluded that its payment of $12.1 million to the ACOE constituted a duplicate benefit for Hawaii because the buildings the ACOE repaired were fully insured by Hawaii, and Hawaii received an insurance settlement to cover their repair costs. The report's recommendation was that FEMA seek reimbursement from Hawaii under § 5155(c).

Hawaii thereupon appealed, first to the FEMA acting regional director, who denied the appeal,[6] and then to the Executive

---

*Federal Emergency Management Agency,* 78 F.Supp.2d 1111, 1121 (D.Haw.1999) (*"Hawaii I"*). Although FEMA's brief on appeal again challenges the accuracy of the $7.4 million figure as the amount actually received, it does so only in passing and provides no argument refuting the district court's rejection of its challenge.

**5.** In an administrative decision it issued in this dispute, FEMA wrote: "Neither the nature nor the amount of the State's insurance

settlement is at issue." In its brief to this court, FEMA states: "The record does not support the State's arguments that FEMA second-guessed the insurance settlement...." FEMA's brief also asserts that "its determination [that Hawaii owes $12.1 million] did not turn on the terms of the State's settlement."

**6.** In the opinion denying Hawaii's first administrative appeal, the acting regional director held that § 5155(c) requires disaster aid recipients to reimburse FEMA for duplica-

Associate Director of FEMA's Response and Recovery Directorate. The Associate Director did not immediately decide the appeal, as he was of the view that an earlier FEMA analysis was not conducted according to a statistically valid method. (That analysis had considered whether the work conducted by the ACOE was covered by Hawaii's insurance.) Instead, the Associate Director first contacted FEMA's Western Territorial Closeout Team (Closeout Team) and requested that it perform a more valid analysis.

The Closeout Team's subsequent report to the Associate Director stated that it could not fully conduct the requested study because, as the Associate Director stated in his final decision, "[t]he information available from the [ACOE] was not sufficient to perform the desired comparison of insurance estimates and [ACOE] work and costs." The same report also stated that FEMA did not have a figure that reflected better than Hawaii's $7.4 million estimate the amount that Hawaii received from its insurance settlement for the ACOE repairs in particular. Concluding that "[w]ithout a defensible basis for assigning a greater portion of the insurance adjustment to [the ACOE] work, it is not reasonable for FEMA to do so," the report recommended that FEMA should seek only $7.4 million from Hawaii.

The Associate Director did not heed the recommendations of the Closeout Team. Instead, he denied Hawaii's appeal. The Associate Director's decision—FEMA's last—pointed out that Hawaii's insurers had presented the state with the option to settle for actual damage repair costs. The final decision went on to determine that

because the $12.1 million total cost of the ACOE repairs was not greater than Hawaii's $42.7 million insurance settlement "we must assume that the settlement was adequate for all work on the buildings in question."

Hawaii next filed suit in federal district court for injunctive and declaratory relief. FEMA moved for summary judgment. The district court issued two decisions, denying FEMA's motion without prejudice in the first and granting it in the second.

In its first opinion, the district court dismissed most of Hawaii's arguments; Hawaii does not appeal these rulings. *Hawaii I*, 78 F.Supp.2d 1111. As to the merits of the duplicative benefits issue, the district court held that § 5155(c) required Hawaii to reimburse not only the duplicative insurance proceeds it had received but also those "available" to it. *Id.* at 1119-20. The district court concluded, however, that FEMA had not provided a rational basis for its determination that Hawaii had $12.1 million in insurance benefits for the disputed repairs "available" to it. *Id.* at 1121. This determination was made without prejudice, and the court invited FEMA to return to the court with a more thorough explanation of its determination that $12.1 million was available to Hawaii. *Id.* at 1124.

FEMA accepted the invitation and submitted an official declaration of one of its officials, written after *Hawaii I*, in which the official explained that FEMA's original audit had been based on a detailed consideration of the language of Hawaii's insurance policy. *Hawaii v. Federal Emergen-*

tive benefits received and for any additional benefits that such recipients possibly could have gotten but did not. The regional director also responded to Hawaii's charge that FEMA had withheld billing records of the disputed repairs. He stated that he was "not aware" of any previous requests by Hawaii

for the billing records of the disputed repairs or of refusals by FEMA to provide this information. Nonetheless, he "agree[d] that the State should be provided with access to any and all documentation maintained by FEMA" regarding the billings.

*cy Management Agency*, 93 F.Supp.2d 1103, 1106 (D.Haw.2000) (*"Hawaii II"*). Giving FEMA's interpretation of the insurance policy deference under the arbitrary and capricious standard of review, the district court ruled that the policy covered the work performed by the ACOE. *Id.* As a result, the court concluded, the full $12.1 million that FEMA spent on the disputed repairs was "available" to Hawaii. "Because the plain language of the insurance policies indicates that the full cost of replacement was available under those policies, FEMA's determination cannot be said to have been arbitrary or capricious." *Id.*

## II. Analysis

As appears from the foregoing account, this dispute hinges upon the meaning of § 5155(c). The relevant portion of that statute reads, once again, "A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source."

Hawaii urges that this provision requires the reimbursement of only those duplicative benefits it actually received. FEMA, on the other hand, argues that this statute makes Hawaii liable for whatever benefits the state could possibly have received under its insurance policy, without regard to whether the state actually received these benefits in its settlement or whether the state's decision to settle with its insurer would have been reasonable had FEMA not been in the picture. We agree with neither party. Instead, we read the statute as sometimes requiring reimbursement beyond what the disaster victim actually received from another source in a

settlement, but only if the settlement was not a commercially reasonable one.

## A. Deference

 Before explaining our decision regarding the proper interpretation of § 5155(c), we briefly consider whether FEMA's interpretation of the statute should prevail even if we disagree with it. Under administrative law principles of deference, in some instances a court may not overturn an agency's interpretation of a statute, even if the court would interpret the statute differently. Levels of deference given to agency statutory interpretations vary with the circumstances, and as the level of deference that a court is required to give increases, so too does the tolerable marginal difference between a court and an agency's interpretations.

Deciding how much deference to grant often presents difficult problems for courts. *See generally United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). In this case, however, we need not make such a determination. Even under the standard that grants maximum deference to an agency's statutory interpretation—the standard described by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)—FEMA's interpretation of § 5155(c) cannot stand.[7]

 *Chevron* lays out a two-part deference formula for determining whether an agency interpretation of a statute should prevail. First, a court asks "whether Congress has spoken directly to the precise question at issue." *Id.* at 842, 104 S.Ct. 2778. If the statute is unambiguous, then "that is the end of the matter," and the unambiguous statute applies regard-

---

7. On appeal, FEMA advances the interpretation of § 5155(c) developed in the decision of its acting regional director in response to Hawaii's first administrative appeal. Be- cause the parties have done so, we consider this interpretation to be FEMA's official interpretation of the statute.

less of the agency's interpretation. *Id.* If, on the other hand, the statute is ambiguous, then a court is to consider whether the agency's interpretation is a reasonable one. *Id.* at 843. If the agency's interpretation is a reasonable one, then it prevails whether or not there is another interpretation consistent—even more consistent—with the statute. *See, e.g., Chevron U.S.A., Inc. v. Echazabal,* — U.S. —, 122 S.Ct. 2045, 2052, 153 L.Ed.2d 82 (2002) (explaining that when an agency's interpretation survives *Chevron* step one, it is "entitled to adherence ... so long as it makes sense of the statut[e] );" *Navajo Nation v. Dep't. of Health & Human Services,* 285 F.3d 864, 869 (9th Cir.2002).

Applying the first step of *Chevron,* we conclude that the statute is in some respects ambiguous, although it is not so ambiguous as to allow Hawaii's interpretation. The principle debate in this case is over what Congress meant by the phrase "benefits available" in § 5155(c). On the one hand, FEMA was correct to reject Hawaii's interpretation, because, as we explain in Part II(B) below, "benefits available" is unambiguous in that it cannot refer only to benefits actually received. As a result, under the first step of *Chevron* we agree with the part of FEMA's interpretation of § 5155(c) that states that parties will sometimes have to reimburse FEMA for more than just the benefits they received.

Just because it is clear that the term "benefits available" defines a set of benefits beyond those actually received, however, that does not mean that the scope of the reimbursement requirement in the

statute is clear. Defining exactly what is "available" to a particular person at a particular time is, as will appear below, an imprecise endeavor made so by the inherent ambiguity of the word "available." [8]

Having determined that § 5155(c) is in one pertinent respect ambiguous, we next consider under *Chevron* whether the interpretation advanced by FEMA is a reasonable one. This consideration takes place below in Part II(C)(3). We conclude there that FEMA's interpretation is not reasonable, because it leads to absurd results, does not forward Congress' purposes, and disregards the uncertainties involved in obtaining insurance coverage. As a result, even if FEMA's interpretation of the statute merits under *Chevron* the most heightened deference, its interpretation may not stand.

**B. Hawaii's Interpretation**

■ Hawaii's position that the word "available" refers exclusively to benefits that people actually receive cannot be squared with the plain meaning of the statute. A benefit may be "available" to a person, whether or not that person actually obtains that benefit. " 'Available' resources are different from those *in hand.*" *Schweiker v. Gray Panthers,* 453 U.S. 34, 48, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981) (emphasis in original).

Hawaii resists this plain meaning interpretation by arguing that such an interpretation would conflict with the rest of the § 5155. Sections 5155(a) and 5155(b)(3), Hawaii points out, restrict duplicative benefits only when a party has already *received* financial assistance for its loss.[9] In

---

**8.** Part II(C)(1) below provides a detailed explanation of this ambiguity.

**9.** Section 5155(a) states:
The President, in consultation with the head of each Federal agency administering any program providing financial assistance to persons, business concerns, or other enti-

ties suffering losses as a result of a major disaster or emergency, shall assure that no such person, business concern, or other entity will receive such assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source.

addition, § 5155(b)(1) also contains a restriction on aid that is triggered by the receipt of duplicative benefits.[10]

That the statute, at different junctures, references benefits available and benefits received, far from creating discord within the statute, indicates that a distinction was intended. *Cf. Duncan v. Walker*, 533 U.S. 167, 173, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (explaining that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion") (quoting *Bates v. United States*, 522 U.S. 23, 29–30, 118 S.Ct. 285, 139 L.Ed.2d 215 (1997)). Together, the subsections of § 5155 preclude a disaster victim from receiving relief from FEMA if it has already received duplicative relief; allow a disaster victim to receive FEMA relief if it is eligible for, but has not yet received, duplicative relief; and require a disaster victim to reimburse FEMA for any duplicative relief that was available to it, whether that relief was received or not.

In the context of the urgency associated with disaster relief, this combination of restrictions and allowances makes perfect sense. If a disaster victim has already received assistance, it does not need duplicative assistance. But if a disaster victim has not yet received the disaster relief it urgently needs, then it makes sense to provide that relief immediately even if that victim is entitled to receive assistance for the same purposes from another source at a later date. After the disaster relief effort is complete, it then becomes possible definitively to determine what benefits were available to the victim for the same purposes from another source. At that point, FEMA is empowered under § 5155(c) to demand reimbursement for that amount.

This plain language reading of § 5155(c) is consistent with one possible purpose of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), §§ 5121–5204c, which includes the disputed statute.[11] We may assume that, as Hawaii argues, one of the Stafford Act's purposes is to "spread[ ] the risk of the cost of major disasters from the citizens of the disaster-stricken community to the citizens of the entire country." An interpretation of § 5155(c) requiring disaster aid recipients to reimburse FEMA for duplicate benefits that were available does not contravene this purpose. To require a state to use money made available to it by another source is not to require the disaster-stricken community to bear the costs of the disaster. It is instead to provide an incentive to disaster victims to ensure that another source that makes benefits available—*not* the citizens of the disaster-stricken community—bears these costs. If the disaster victim fails to take advantage of the resources that it has available to it, then it may indeed bear the costs of the disaster alone. But then it is the victim,

---

Section 5155(b)(3) states:
> Receipt of partial benefits for a major disaster or emergency shall not preclude provision of additional Federal assistance for any part of a loss or need for which benefits have not been provided.

**10.** Section 5155(b)(1) states:
> This section shall not prohibit the provision of Federal assistance to a person who is or may be entitled to receive benefits for the same purposes from another source if such person has not received such other benefits by the time of application for Federal assistance and if such person agrees to repay all duplicative assistance to the agency providing the Federal assistance.

**11.** The current § 5155 replaced an earlier version of the statute. *See* Disaster Relief and Emergency Assistance Amendments of 1988, Pub.L. 100–707, Title I, § 105(i) (1988).

rather than fate or federal law, that bears responsibility for that result.

Hawaii claims that under any interpretation other than its own, the state would have been better off with no insurance at all, because then the question of duplicative benefits would not arise and FEMA would not be requesting $12.1 million. While the latter is true, this argument does not account for the fact that Hawaii received an insurance settlement totaling $42.7 million. If the state had no insurance, it would have not received the $30.6 million that FEMA has not claimed, and, in fact, would be much worse off then it is now.

As the circumstances in this case demonstrate, potential disaster victims still have plenty of incentive to maintain insurance. In fact, many—probably most—calamities that befall them will not be so extensive as to support a disaster area declaration at all, so gambling on the availability of federal disaster relief would be a poor bet.

Furthermore, Hawaii's interpretation of the statute does not lead to the most appealing results either. Under Hawaii's interpretation, a state would have no incentive to pursue benefits under its insurance policies because, with federal aid as a fallback, it would suffer no penalty for failing to do so. If a disaster victim did not pursue these benefits, this inaction would effectively create a federal subsidy for insurance companies, who would be relieved by the victim's inaction from their contractual obligation to pay out benefits in a disaster despite having received premiums premised on that obligation.

Congress' choice between these two incentive schemes is clear from the language of § 5155(c). That choice was to place *some* burden upon disaster victims to pursue alternative sources of disaster relief. The more difficult problem, to which we now turn, is to delineate the precise extent of that burden in the current context.

## C. The Proper Interpretation of "Available"

■ The question, then, is whether money is "available" to a party from its insurers under § 5155(c) when the party reasonably settles for less. Put another way, does the statute require disaster victims to pursue additional insurance benefits when a reasonable insured faced with the same situation and no alternative source of funds might chose to take an insurance settlement instead?

The answer to the question, however posed, is no. The statute's requirement that a disaster aid recipient reimburse FEMA for any relief that was "available to the person for the same purpose from another source" requires the recipient to reimburse FEMA both for the duplicate benefits it actually received and any benefits that it would have obtained if it acted in a commercially reasonable manner with regard to its settlement claim. At the same time, for reasons we explain below, § 5155(c) does not require insured disaster victims to pursue a course of action with regard to obtaining insurance benefits that disregards competing considerations any other insured would reasonably take into account.

### 1. Text

To decipher § 5155(c)'s meaning and to determine whether FEMA's interpretation of the statute is a reasonable one, we turn first to the text of the statute, and in particular, to the import of the word "available."

As the dictionary definitions of the word reveal, the term "available" is ambiguous in the current context. As here relevant, the dictionary defines "available," on the one hand, as "[p]resent and ready for use;

at hand; accessible" and, on the other, as "[c]apable of being used or gotten; obtainable." The American Heritage Dictionary of the English Language 127 (3d ed.2000). Under the first definition, "available" takes into account practical considerations, as the synonym "accessible" implies; under the second definition, the term suggests instead a more abstract or theoretical concept, without regard for cost, risk, or uncertainty.

Some examples may help to illustrate this contrast. Consider a person who offers to a friend, who lives in San Francisco, tickets to a San Francisco Giants game taking place the next day, on the condition that the friend stop by her office to pick the tickets up. If the office is down the block, those tickets are "available" whether or not the friend picks them up. If however, the office is in New York City, the tickets are "available" only in theory. While it is physically possible to purchase plane tickets and make the coast-to-coast-to-coast journey within a day, by any practical measure the tickets are not "available," particularly since the friend could simply purchase different tickets to the same game at the ballpark box office for a fraction of the airfare cost.

Similarly, undiscovered treasure undoubtedly lies at the bottom of the sea, and anyone who finds the treasure may keep it. In one sense, then, that treasure is "available" to all including those who could but choose not to invest money in pursuit of the treasure, those unwilling to take the risks involved in deep sea diving, and those who do not have enough information to pinpoint the most likely place to search. But more usually, one would say that the treasure is not "available" to people who reasonably deem finding it too costly, or too risky, or too uncertain.

These examples, extreme though they may be, illustrate how practical considerations such as risk, cost, and uncertainty

are inherent in the more usual concept of availability. Where one person might consider unlikely or inconvenient possibilities to be available, a more practical person would not.

Applied to the particular context before us, the term "available" has a similar ambiguity. In deciding whether to enter into a loss estimate settlement with its insurer, Hawaii had the choice of giving up a bird in the hand for one in the bush—or, put another way, benefits "at hand" for those "obtainable." Looked at from the point of view of the decision-makers at the time the decision was made, the total loss estimate benefits for all Hawaii's losses could have amounted to more or to less money than the benefits it would collect if paid the actual cost repairs as they were made; estimates are inherently imprecise. At the same time, accepting the loss estimate payments cut transaction costs in dealing with the insurance companies, eliminated the risk of disputes with the insurers concerning the propriety of certain repairs or contracting decisions or the choice of contractors, and provided certainty as to the amount of money that Hawaii would have to work within. To prefer funds that were "present and ready for use" over future "obtainable" payments, even if possibly higher, was consistent with the more likely meaning, in the present context, of the term "available."

### 2. Legislative History

Looking to sources other than the language alone confirms that Hawaii's reasonable choice to accept what was "at hand" or "accessible" precluded FEMA from maintaining that additional benefits were "available." The statute's legislative history is of some—albeit limited—help in illuminating this issue. *United States v. Davidson*, 246 F.3d 1240, 1246 (9th Cir. 2001) (if plain language of statute is ambiguous a court may look to legislative history to help determine intent of legislature).

Congress passed the current version of § 5155 in 1988 along with other, sweeping changes to the Stafford Act. While legislative history discussing § 5155(c) as finally enacted is non-existent, there is an explanation regarding why Congress addressed the issue of reimbursing duplicative benefits to FEMA.

The Senate Committee on Environment and Public Works addressed this topic when considering a bill that was a precursor to the one eventually enacted. The Committee report explained that FEMA had done a study that showed "that in some cases, disaster assistance provided what should have been covered by an applicant's insurance. It appears that insurance companies are not paying claims in a timely manner, or that applicants are not filing claims for items which should have been covered." S.Rep. No. 100–524 at 13 (1988). To remedy this situation, the Report explained that the proposed bill "gives FEMA and other disaster assistance agencies and organizations a strong new mandate to provide disaster assistance only when insurance proceeds to which a person is entitled have been considered and the need for supplemental assistance remains." [12] *Id.* Congress' concern, then, was that when there was the safety net of federal disaster relief, covered parties and insurers were not seeking or providing insurance coverage as they otherwise would.

Section 5155(c) addresses this concern through its requirement that disaster aid recipients reimburse FEMA for any available benefits regardless of whether the aid recipient actually receives the benefit. To understand this requirement as mandating that a party take the steps that a party would reasonably take in the absence of federal disaster relief provides the requisite incentive to disaster victims to consider the availability of insurance proceeds and file claims for covered items. To insist instead that a disaster victim must take steps that it would not normally take regarding insurance coverage would be to demand that a disaster-stricken party be more vigilant in recovering dollars for the federal government than it would be in recovering dollars for itself. To require such hyper vigilance would go beyond solving the problem that generated the statutory language.

So, although the legislative history is far from decisive, it suggests that § 5155(c) was intended simply to ensure that disaster relief victims and insurers not take advantage of federal largess. As such, the history points toward the more practical "accessible" or "at hand" meaning of "available."

### 3. Other Considerations

■ The guidance provided by § 5155(c)'s text and the suggestive but

---

**12.** The proposed statute discussed in S.Rep. No. 100–524, Senate Bill 2380, provided in pertinent part:

Agencies or other organizations providing Federal assistance for needs for losses resulting from a major disaster or emergency shall assure that no person, business concern, or other entity receives any such Federal assistance if said person, business concern, or entity receives or is entitled to receive benefits for the same purposes from insurance or any other Federal or non-Federal source: Provided, That nothing in this section shall prohibit the provision of Federal assistance to a person, business concern, or other entity who is or may be entitled to receive benefits for the same purposes from insurance ... when any such applicant for Federal assistance has not received such other benefits by the time of application for Federal assistance, so long as the applicant for Federal assistance agrees as a condition of receipt of Federal assistance to repay duplicative assistance from insurance ....

S.Rep. No. 100–524 at 41 (1988).

limited legislative history, taken together, suggests, then, that the statute was passed to ensure that disaster relief victims take the same practical steps toward funding their recovery effort as would disaster victims not entitled to federal aid. Neither the text nor the legislative history, however, provides a standard for determining when a party has satisfactorily taken such steps. For guidance, we turn to another area of the law that involves a somewhat similar situation.

The "commercially reasonable" standard is frequently used in the secured lending context. In that setting, the standard requires a secured party who takes over a defaulted debtor's collateral to dispose of the property in the same manner that a party who is not a secured lender would dispose of the property. The problem addressed is that a secured lender has no inherent incentive to sell the collateral for anything more than the amount of his security interest. The Uniform Commercial Code's ("U.C.C.") "commercially reasonable" standard serves to test the behavior of a person or entity who has an incentive to disregard the interests of a third involved party by asking how a person acting on his own behalf, without any such incentive, would behave.[13]

In construing § 5155(c), we are faced with a problem similar to that addressed by the U.C.C. with regard to secured lenders: A disaster victim who can obtain funds from FEMA has little incentive to pursue the maximum amount of money available to it, but failing to do so could injure a third party—here, the federal government. In contrast, parties who cannot fall back on federal disaster relief have every incentive to pursue benefits from its insurer. So we may assume that a party that negotiates a commercially reasonable insurance settlement—a settlement that an entity or individual without other recourse would accept in the circumstances—has not been influenced by the absence of direct pocket-book incentives. Notably, the commercially reasonable standard does not require a party to do whatever it takes to acquire benefits, no matter how remote the chance of success and no matter how costly the effort.[14]

To transpose this concept to a context closer to the present one: Just as it is usually not commercially reasonable to scour the bottom of the sea for sunken treasure, so it may also be commercially unreasonable to sue an insurer who does not accede to a demanded-for settlement, because the cost, time, and riskiness of litigation makes its pursuit appear not worthwhile. That is true even though, if undertaken, the litigation ultimately may reward its risk-taking, commercially unreasonable litigator with more benefits than a more conservative, commercially reasonable party would receive.

---

13. U.C.C. § 9–627(b) & (c) (2001) explains:

(b) [Dispositions that are commercially reasonable.] A disposition of collateral is made in a commercially reasonable manner if the disposition is made:
(1) in the usual manner on any recognized market;
(2) at the price current in any recognized market at the time of the disposition; or
(3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.

14. U.C.C. § 9–627(a) states:

(a) [Greater amount obtainable under other circumstances; no preclusion of commercial reasonableness.] The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

The commercially reasonable approach to § 5155(c)'s use of "available" fully comports with the policy purposes underlying the statute. So understood, the statute requires disaster victims to seek out benefits with the perseverance and risk averseness that a party acting in a commercially reasonable manner would. As such, the statute provides disaster victims with adequate incentive to assure that insurers bear their fair share of disaster relief.

FEMA's alternative reading, in contrast, would require disaster victims to pursue reckless litigation, accept settlement offers that could result in higher benefits but impose unreasonable delays, or hire expert negotiators who charge premium rates even if the high rates would probably not result in a commensurate increase in benefits. This approach makes little sense for two reasons: First, to require disaster victims to engage in commercially unreasonable behavior could hamper the disaster relief process by requiring victims to forego prompt receipt of insurance funds and to spend unreasonable amounts of time and money better spent directly on cleaning up from the disaster. Second, as a matter of likely economic behavior, one can assume that in the aggregate, decisions made by individuals and entities acting on their own behalf result in spreading relief costs to their insurers to the maximum extent practically possible; to require more aggressive pursuit of benefits than disaster victims would undertake in the absence of FEMA is therefore unlikely, again in the aggregate, actually to spread any additional costs to the insurers.

It is, of course, "not unheard of for a court to find that an agency interpretation is not reasonable." *John v. United States,* 247 F.3d 1032, 1042 (9th Cir.2001) (en banc) (Tallman, J., concurring) (collecting cases). For the foregoing reasons, we conclude that FEMA's interpretation of § 5155(c) as requiring aid recipients to reimburse insurance benefits they reasonably did not pursue after balancing the pertinent costs, risks, and uncertainties of doing so is itself not reasonable. Rather, § 5155(c) requires disaster aid recipients to reimburse FEMA the duplicative benefits that they actually received and also requires the recipients to reimburse any additional benefits that they would have received had they acted in a commercially reasonable manner.

■ The record makes it abundantly clear that Hawaii acted in a commercially reasonable manner when it settled with its insurers. Rebuilding from the worst disaster ever to hit the state, Hawaii opted to receive insurance proceeds immediately, in an amount recommended by two independent insurance adjusters. Even now, the benefit of hindsight does not indicate that Hawaii made the wrong choice. Although the ACOE's repairs ended up costing more than the adjusters' estimated costs, there is no guarantee that Hawaii's insurers would have paid for all of the disputed repairs if Hawaii had selected the "actual cost basis" settlement option. As Hawaii's comptroller noted in 1993, the insurers may have balked at reimbursement in instances when "the replacement or repair is modified from the original building." Also, the insurers would undoubtedly have required detailed substantiation of the repairs, much more detailed than the ACOE bills FEMA's own Closeout Team found inadequate. Notably, throughout the dispute, FEMA has avoided casting any aspersion on Hawaii's settlement with its insurers.

We conclude that Hawaii did pursue and receive the insurance payments "available" for the disputed repairs.

### III. Conclusion

The proper approach to determining if a disaster aid recipient adequately sought

out "available" benefits is to inquire whether the recipient acted in a commercially reasonable manner in determining the amount of insurance proceeds to accept. Because Hawaii so acted, it owes FEMA, under § 5155(c), only the amount of insurance proceeds it actually received to make the disputed repairs.

For the reasons stated herein, we REVERSE and REMAND this case for further proceedings in accordance with this opinion.