371 F.3d 701
 PUBLIC UTILITY DISTRICT NO. 1 OF SNOHOMISH COUNTY, WASHINGTON, a Washington municipal corporation, Plaintiff-Appellant,
v.
FEDERAL EMERGENCY MANAGEMENT AGENCY; Michael D. Brown,* Under Secretary of Emergency Preparedness and Response, Department of Homeland Security; Tammy Doherty, as its Acting Regional Director for Region X, Defendants-Appellees.
 No. 03-35104.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 1, 2004.
 Filed June 14, 2004.
 
 COPYRIGHT MATERIAL OMITTED Michael A. Goldfarb, Law Offices of Michael A. Goldfarb, for the plaintiff-appellant.
 Catherine Y. Hancock, United States Department of Justice, Civil Division, for the defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington; Marsha J. Pechman, District Judge, Presiding. D.C. No. CV-01-01384-MJP.
 Before: CANBY, WARDLAW, and GOULD, Circuit Judges.
 GOULD, Circuit Judge:
 
 
 1
 Public Utility District No. 1 of Snohomish County, Washington ("the District") appeals the district court's grant of summary judgment to the Federal Emergency Management Agency ("FEMA"), in this suit filed under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court.
 
 
 2
 * A
 
 
 3
 The District provides electric power and water services for about 230,000 customers in Snohomish County and Camano Island in the State of Washington. From November 7, 1995, through December 18, 1995, severe winter storms battered parts of western Washington state (including areas served by the District) with high winds, heavy rain, and flooding. These storms damaged the District's electric power distribution network, and the District at once began work to restore power.
 
 
 4
 On January 3, 1996, the President of the United States declared that a major disaster, as defined by the Robert T. Stafford Disaster Relief and Emergency Assistance Act of 1974 ("the Stafford Act"), 42 U.S.C. § 5121 et seq., had taken place in Washington state. The benign effect of the President's designation was that public utilities reeling from the severe weather, such as the District, could apply for federal disaster relief grants administered by FEMA. On January 10, 1996, after the District had completed most of the needed repairs related to the storms, the District submitted a notice of intent to apply for a federal disaster relief grant. FEMA inspected the work performed by the District and prepared a Damage Survey Report ("DSR") on January 29, 1996. In this DSR, FEMA inspectors "identif[ied] the eligible scope of work and prepare[d] a quantitative estimate for the eligible work." 44 C.F.R. § 206.202(d)(1) (1996).[1]
 
 
 5
 As part of its application for federal disaster relief, the District included its expenses in giving employee fringe benefits such as paid vacation leave and Medicare. It was the District's policy to append a thirty-six percent "fringe benefit overhead rate" to each hour of straight-time and overtime labor worked by District employees to account for the costs of providing fringe benefits. The District arrived at the thirty-six percent rate by taking its total cost of fringe benefits and dividing by the total number of labor hours (straight-time and overtime) worked by District employees for a given time period. The District used the thirty-six percent rate for straight-time and overtime labor because the District's payroll computer system could process only one fringe benefit overhead rate.
 
 
 6
 The dispute in this litigation arises because the thirty-six percent rate did not reflect the District's actual expenses for providing fringe benefits for overtime labor. This was because the District's expenses remained constant for some benefits such as employee leave, employee insurance, and unemployment benefits, no matter how many overtime hours were worked by its employees. By its own calculation, the District's actual fringe benefit overhead rate for overtime labor was about ten percent, not the thirty-six percent rate set in the District's calculations for disaster relief.
 
 
 7
 FEMA at first determined that the District's total cost of repair work attributable to the 1995 storm (the District's "amount eligible," in FEMA parlance) was $5,080,232. This amount incorporated the District's use of the thirty-six percent fringe benefit overhead rate for overtime labor. The District received seventy-five percent of its amount eligible from FEMA and twelve and one-half percent of its amount eligible from the State of Washington Emergency Management Division ("EMD").[2] The District was responsible for the remainder. The District received a disaster relief grant from FEMA for $3,871,576 for the 1995 storm.
 
 
 8
 On May 15, 1998, the EMD informed the District that FEMA and the State of Washington had closed the administrative process for the District's disaster relief application relating to the 1995 storm.[3] However, the District was also informed that "the District's records [were] subject to inspection by state and federal officials" for three years after the date of the administrative closeout.
 
 
 9
 Mother nature frowned on Washington state yet again, as another severe storm damaged the District's electric power distribution network on December 26, 1996. On January 17, 1997, the President declared that a major disaster had occurred. On January 28, 1997, the District submitted its notice of intent to apply for federal disaster relief, and again included the thirty-six percent fringe benefit overhead rate into its application. FEMA determined that the District's amount eligible for the 1996 storm was $1,129,599, and the District received a FEMA grant for $869,496. On September 15, 1998, the EMD informed the District that the administrative process regarding the District's aid application relating to the 1996 storm was closed. The EMD's notice also said that "the District's records [were] subject to inspection by state and federal officials" for six years.
 
 B
 
 10
 FEMA's Inspector General conducted audits of the federal disaster relief grants received by the District for the 1995 and 1996 storms, and issued a report in May 2000. In the report, the Inspector General recommended that FEMA reduce the District's amount eligible for the 1995 and 1996 storms by $623,092 and $200,404, respectively. The recommended reductions reflected the Inspector General's determination that the District's applications for federal disaster relief for both storms included "questionable costs" in three areas: (1) the District overstated fringe benefit costs by using a thirty-six percent fringe benefit overhead rate for overtime labor when the actual rate was only ten percent; (2) the District's application included ineligible costs for maintenance and repair of District equipment; and (3) the District overstated equipment use hours, wherein some equipment was billed for over 24 hours of usage in a single day. The Inspector General also found that the District failed to incorporate credits that could have decreased the District's "amount eligible." The reasons were, first, that the District did not offset its costs for credits due from a utility company, when the District repaired utility poles jointly-owned with a utility company and the District was entitled to reimbursement from the utility company, and second, that the District did not offset its costs for funds received from the sale of scrap materials gathered during the two storms. FEMA adopted the recommendations of its Inspector General and demanded that the District return $473,150 in federal aid for the 1995 storm and $153,016 for the 1996 storm. In FEMA parlance, FEMA "deobligated" funding to the District in those amounts. The District appealed FEMA's determinations as to both storms on January 2, 2001.[4] FEMA rejected these appeals on July 20, 2001.[5]
 
 
 11
 Dissatisfied with the agency order requiring the District's repayment to FEMA of prior federal aid, based on the audits, the District filed this lawsuit in the U.S. District Court for the Western District of Washington on September 6, 2001, alleging that FEMA's audit determinations violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. On December 11, 2002, the district court granted FEMA's motion for summary judgment and denied the District's motion for summary judgment. As pertinent to this appeal, the district court held: (1) res judicata did not apply to FEMA's initial determination of the District's eligibility for aid; (2) FEMA had the authority to conduct a post-award audit of its federal disaster relief grants to the District; and (3) FEMA's audit determinations were not arbitrary and capricious.
 
 
 12
 Each of these holdings are challenged on appeal.
 
 II
 
 13
 Our review of agency action is governed by the APA. Under the APA, we may set aside agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Wilderness Soc'y v. United States Fish & Wildlife Serv., 353 F.3d 1051, 1059 (9th Cir.2003) (en banc) (internal quotation omitted). The standard is a narrow one, and the reviewing court may not substitute its judgment for that of the agency. Environmental Def. Ctr., Inc. v. U.S. EPA, 344 F.3d 832, 858 n. 36 (9th Cir.2003). However, "the agency must articulate a rational connection between the facts found and the conclusions made." Id. Also, we "must give substantial deference to an agency's interpretation of its own regulations." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994). The district court's decision to grant summary judgment is reviewed de novo. Keystone Land & Dev. Co. v. Xerox Corp., 353 F.3d 1070, 1073 n. 1 (9th Cir.2003).
 
 III
 
 14
 * The District contends that FEMA's Inspector General exceeded its authority in auditing the District's grants, and that the Inspector General "may verify that the recipient is in compliance with the grant award conditions," but may not "rewrite the grant award conditions." In addition, the District argues that grant funds provided by FEMA can be "deobligated" only if FEMA determines that the recipient has not complied with rules or regulations governing the grant.
 
 
 15
 FEMA regulations defined the duties of its Inspector General as the following: "[p]erformance of all audit functions relating to programs and operations of FEMA;" and "[i]nspection of agency activities to identify actual or potential fraud, waste, abuse, or mismanagement and to develop recommendations for corrective action." 44 C.F.R. § 2.12(b)(1) and (2) (1996). More generally, FEMA was empowered to conduct audits and investigations relating to its administration of federal disaster relief grants to assure compliance with the Stafford Act. 44 C.F.R. § 206.16(a) (1996). FEMA regulations said that the administrative closeout of a grant did not affect FEMA's right to "disallow costs and recover funds on the basis of a later audit or other review." 44 C.F.R. § 13.51(a) (1996). Similarly, under FEMA regulations the administrative closeout of a grant did not affect a grant recipient's "obligation to return any funds due as a result of later refunds, corrections, or other transactions." 44 C.F.R. § 13.51(b) (1996). See also 44 C.F.R. § 13.52(a) (1996) ("[a]ny funds paid to a grantee in excess of the amount to which the grantee is finally determined to be entitled under the terms of the award constitute a debt to the Federal Government."). In these regulations, there was clear statutory authority for FEMA and its Inspector General to conduct post-award audits of federal disaster relief grants.
 
 
 16
 Contrary to the District's contentions, FEMA did not rewrite the grant award conditions in this case by conducting a post-award audit. The District attempts to frame FEMA's rejection of the District's thirty-six percent fringe benefit overhead rate as a material change in the terms of the grants awarded to the District. However, nothing in the record establishes that the District's use of the thirty-six percent fringe benefit overhead rate was a "term" of the disaster relief grant. Rather, the record reflects that the District's total labor expenses were one line item in the DSR. That FEMA later rejected the District's use of the thirty-six percent rate did not materially alter the terms of the grant (i.e., that the District was eligible for federal disaster relief for actual costs incurred in repairing damage related to the storms), but rather reflected FEMA's determination that the District's reported expenses for fringe benefits exceeded its actual expenses.
 
 
 17
 The District's reliance on Graham v. FEMA, 149 F.3d 997 (9th Cir.1998) is misplaced. In Graham, FEMA refused to disburse funds for disaster relief grants that had been approved and "obligated" due to a dispute in how the grants were administered at the local level. 149 F.3d at 1000. We held in Graham that "[t]he Stafford Act's regulations grant FEMA the discretion to withhold individual and family grant funds only if the grantee-state has not complied with the award conditions." Id. at 1006 (internal quotation marks omitted). In contrast to Graham, here FEMA has disbursed the funds that were obligated for the 1995 and 1996 storms. FEMA is attempting to recover a portion of the already distributed funds that, in FEMA's judgment, the District was not entitled to receive. Graham is factually distinguishable and has no application here.
 
 
 18
 FEMA's authority to conduct post-award audits of federal disaster relief grants is not only supported by FEMA regulations, but is appropriate in light of the unique quandary that FEMA confronts in administering disaster relief assistance. FEMA, as with any other agency of government, is confronted with finite financial resources. Yet, when natural disasters occur, FEMA's policy says appropriately that "eligible assistance be delivered as expeditiously as possible consistent with Federal laws and regulations." 44 C.F.R. § 206.200(b) (1996). In following this policy, FEMA is necessarily limited in the amount of investigation it may undertake before making an initial determination of aid eligibility. Because FEMA is permitted to conduct post-award audits of federal disaster relief grants, FEMA can promptly provide disaster relief, and also ensure that the disaster relief grants it disburses to grant recipients are used in ways consistent with the Stafford Act and FEMA regulations.
 
 
 19
 We hold that FEMA and its Inspector General had the authority to conduct post- award audits of the District's disaster relief grants.
 
 B
 
 20
 The District next contends that the district court should have applied res judicata to FEMA's initial calculation of the District's "amounts eligible" for the 1995 and 1996 storms. The district court concluded that res judicata did not apply to FEMA's initial calculation because FEMA's regulations allowed it to audit disaster relief grants after issuance.
 
 
 21
 The Supreme Court has held that res judicata may be applied to agency actions "[w]hen an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." Astoria Fed. Sav. and Loan Ass'n. v. Solimino, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) (internal quotation marks omitted). Conversely, courts have declined to apply res judicata to administrative decisions that were not reached by an agency acting in a judicial capacity. In Littlejohn v. United States, 321 F.3d 915 (9th Cir.2003), we declined to apply res judicata to a benefits determination made by the Department of Veterans Affairs ("VA"), holding:
 
 
 22
 [t]he structure of the disability benefit process prevented the VA from raising a causation defense at that time. Disability hearings are ex parte and non-adversarial. Evidence presented in a [38 U.S.C.] § 1151 benefits hearing is limited to information presented by the claimant and certain types of information discovered by the VA. The VA is not authorized to develop evidence for the purpose of challenging the claimant, but rather is required to "assist a claimant in developing the facts pertinent to [his or her] claim." 38 C.F.R. § 3.103.... This claimant-friendly system provides no opportunity for the VA to develop and offer evidence of the kind that eventually proved the undoing of Littlejohn's [Federal Tort Claims Act] claim. Claim preclusion is inappropriate.
 
 
 23
 Littlejohn, 321 F.3d at 920-21 (internal citations and footnotes omitted). See also Delamater v. Schweiker, 721 F.2d 50, 54 (2d Cir.1983) (per curiam) (declining to apply res judicata to an administrative decision where "[t]here was no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation").
 
 
 24
 Here, FEMA's initial determination of aid eligibility was structured to achieve the goal that "eligible assistance be delivered as expeditiously as possible consistent with Federal laws and regulations." 44 C.F.R. § 206.200(b) (1996). This policy, which is "claimant-friendly," Littlejohn, 321 F.3d at 921, was designed to expedite the process of providing disaster relief to eligible applicants. FEMA did not act in a "judicial capacity" when it made the initial determination of the District's aid eligibility for the 1995 and 1996 storms in that there was "no hearing, no testimony, no subpoenaed evidence, no argument, no opportunity to test any contention by confrontation." Schweiker, 721 F.2d at 54. The district court concluded correctly that FEMA was not barred by res judicata from conducting a post-award audit of disaster relief grants relating to the 1995 and 1996 storms.
 
 C
 
 25
 We turn to the issue of whether FEMA acted in an arbitrary and capricious manner in reaching its audit determinations. The District argues that FEMA's determinations as to the District's thirty-six percent fringe benefit overhead rate, labor costs, credits for joint ownership of poles, and scrap materials were arbitrary and capricious. We address each of these contentions in turn.
 
 
 26
 * The District contends that FEMA acted in an arbitrary and capricious manner in determining that the District's use of the thirty-six percent fringe benefit overhead rate was unreasonable. FEMA concluded that the District's use of the thirty-six percent rate for overtime labor was unreasonable because the District's actual fringe benefit overhead rate for overtime labor was ten percent. FEMA determined that, as a result of the District's use of the thirty-six percent blended rate, the District overstated fringe benefit costs by $514,719 for the 1995 storm, and by $149,697 for the 1996 storm.
 
 
 27
 First, the District argues that there was no FEMA policy about calculation of fringe benefit overhead costs, and thus there was no basis for FEMA's rejection of the thirty-six percent rate. Yet, counsel for the District conceded at oral argument that FEMA had a policy in place when FEMA granted the District's request for disaster relief, set forth in OMB Circular A-87.[6] This policy, which "establishe[d] principles and standards for determining costs for Federal awards carried out through grants," said in relevant part, "the costs of fringe benefits are allowable to the extent that the benefits are reasonable and are required by law ..." Applying this policy, FEMA determined that "applying the same fringe benefits rate to regular and overtime labor [was] not reasonable because certain benefits are accrued at fixed rates regardless of the overtime hours worked." The District's argument that there was no policy in place regarding fringe benefits has no basis in fact.
 
 
 28
 Second, the District argues that FEMA's determination regarding the fringe benefit overhead rate was arbitrary and capricious because FEMA used differing rationales at the Inspector General and agency levels to reject the District's appeals. FEMA's Inspector General determined that the District's thirty-six percent fringe benefit overhead rate for overtime labor was unreasonable "because certain benefits are accrued at fixed rates regardless of the overtime hours worked," and the Inspector General concluded that the District had overstated claimed costs in this area. In denying the District's appeal at the agency level, FEMA said that "FEMA grants are based on actual costs incurred." Contrary to the District's contentions, these two rationales are consistent. The Inspector General's conclusion that the District's claim for fringe benefit costs was "unreasonable" because the District had overstated its costs was consistent with FEMA's determination that "grants are based on actual costs incurred." We reject the District's argument on this score.
 
 
 29
 Third, the District contends that FEMA reversed its initial approval of the fringe benefit calculation without new evidence. But in our view this contention is not persuasive. New evidence should not be required to justify the audit of past calculations. FEMA's regulations specifically permit it to audit a disaster relief grant after it has been closed out, 44 C.F.R. § 13.51(a) (1996), and the District has not cited to any regulation or statute requiring FEMA to develop "new evidence" for conducting an audit or demanding partial repayment of a disaster relief grant. Nor would it be sensible to establish such a barrier to government audit of benefits given from government coffers, which inevitably are filled by taxpayers' contributions.
 
 
 30
 Fourth, the District cites OMB Circular A-87 to establish that the District's use of the thirty-six percent rate was "reasonable." OMB Circular A-87, Paragraph 11(b) says that "[c]ompensation for employees engaged in work in Federal awards will be considered reasonable to the extent that it is consistent with that paid for similar work in other activities of the governmental unit." This provision deems compensation amounts reasonable where such amounts are comparable to other work performed by the District. Here, FEMA does not challenge the amount of fringe benefit compensation that was provided to District employees, but rather that the District's reported cost of providing such benefits exceeded the District's actual cost. The District's reference to OMB Circular A-87, Paragraph 11(b) is irrelevant and should not control.
 
 
 31
 Finally, the District argues that its use of the thirty-six percent fringe benefit overhead rate resulted from an accepted accounting practice that FEMA initially approved in the DSR, and FEMA was precluded from concluding otherwise in its audit. But this argument misses the point. FEMA's initial determination of aid eligibility for the 1995 and 1996 storms represented FEMA's determination as to the amount of aid for which the District was eligible, and not a particular method with which the eligibility amount was calculated. Although FEMA's initial determination of aid eligibility included the District's use of the thirty-six percent fringe benefit overhead rate, the initial determination was not an express approval by FEMA of the District's use of the thirty-six percent fringe benefit overhead rate. Were we here to accept the District's reasoning, every initial determination of aid eligibility made by FEMA in a DSR would be final and non-reviewable by audit because every determination incorporates some method of reaching a given dollar amount.
 
 
 32
 We need not ponder whether the District's use of a uniform fringe benefit overhead rate is a "proper" or commonly-accepted method of accounting for such expenses. This fact remains: the District has never challenged FEMA's contention that the District's actual fringe benefit expenses for overtime labor for work attributable to the 1995 and 1996 storms was about ten percent, as opposed to the thirty-six percent billed by the District.
 
 
 33
 The District's use of the thirty-six percent rate resulted in a sizable windfall — in excess of $600,000 — for the District. That this windfall may have resulted from the District's use of an accepted accounting practice is of no consequence. In its declaration of intent for the Stafford Act, Congress made plain that it sought: "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C. § 5121(b) (emphasis added). Here, FEMA's role was to provide financial assistance for damage resulting from natural disasters. FEMA did not act in an arbitrary and capricious manner by challenging the District's use of the thirty-six percent fringe benefit rate, where the use of the rate resulted in FEMA paying District expenses having nothing to do with the disasters for which federal relief was given.
 
 2
 
 34
 FEMA determined that the District was ineligible to receive compensation for overtime labor costs attributed to repair and maintenance of the District's equipment during the 1995 and 1996 storms because FEMA's compensation rates for equipment use already included compensation for such costs. The District contends that FEMA's determination regarding these costs was arbitrary and capricious because FEMA had previously approved the costs.
 
 
 35
 The District's argument is without merit. FEMA was empowered to conduct audits of its grants to ensure compliance with its regulations even after they are administratively closed out. 44 C.F.R. § 13.51(a) (1996). That FEMA at first authorized the labor costs in the DSRs, and then later determined in an audit that the District's reported costs exceeded actual costs, does not render the audit determinations arbitrary and capricious.[7] Further, the District does not challenge FEMA's interpretation of 44 C.F.R. § 206.228(a) (1996) as saying that FEMA's equipment rates already incorporate "the costs of operation, insurance, depreciation, and maintenance."
 
 3
 
 36
 The District contends that FEMA acted in an arbitrary and capricious manner when it concluded that the District failed to incorporate credits for costs for utility pole repairs that could have been reimbursed by a utility company because "the issue of ownership for joint ownership of power poles was addressed at the time and accepted by FEMA."
 
 
 37
 During the 1995 and 1996 storms, the District repaired or replaced 194 transmission line poles. Some of the transmission line poles were wholly-owned by the District, while others were jointly-owned with GTE, a utility company. District employees did not keep track of whether the poles were wholly-owned by the District or jointly-owned with GTE for 68 out of the 194 poles repaired. FEMA calculated that the District wholly-owned about sixty percent of the poles repaired and jointly-owned about forty percent of the poles with GTE. With regard to the 68 poles repaired for which the District did not determine ownership, FEMA applied the sixty percent/forty percent ownership ratio and determined that the District did not account for credits due to the District from GTE for repair of transmission line poles jointly-owned with GTE.
 
 
 38
 FEMA's demand for repayment in this context was based on 42 U.S.C. § 5155(c), which said in relevant part, "[a] person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source." We recently interpreted this statutory provision and observed, "[42 U.S.C. § 5155(c)'s] requirement that a disaster aid recipient reimburse FEMA for any relief that was `available to the person for the same purpose from another source' requires the recipient to reimburse FEMA both for the duplicate benefits it actually received and any benefits that it would have obtained if it acted in a commercially reasonable manner...." State of Hawaii ex rel. Atty. Gen. v. FEMA, 294 F.3d 1152, 1161 (9th Cir.2002).
 
 
 39
 Here, the district court concluded that the District had not acted in a commercially reasonable manner by failing to determine which poles were jointly-owned with GTE and that FEMA's demand for repayment in this context was not arbitrary and capricious. We find no error in the district court's conclusion. First, the District does not offer any reason as to why it identified the ownership of only some of the utility poles it repaired. Because the District would have been entitled to reimbursement from GTE for repairing some of the utility poles that the District jointly-owned with GTE, it was not commercially reasonable for the District to identify the ownership of only some of the utility poles it repaired. Second, all references to the record offered by the District that mention reimbursement from GTE say that they are estimates. The application process for the District's federal disaster relief grants accounted for the fact that the District's final amount eligible would have to be adjusted for any credits due to the District from GTE for repair of jointly-owned utility poles. FEMA's determination in this regard was not arbitrary and capricious.
 
 4
 
 40
 Finally, the District contends that FEMA's determination on scrap materials credits was arbitrary and capricious. FEMA demanded that the District repay $9,414 in aid from the 1995 storm and $4,673 in aid from the 1996 storm to compensate for funds received by the District in its sale of scrap materials.
 
 
 41
 The District conducted a sale of scrap materials after the 1995 and 1996 storms. While the District did not account for the source of the scrap materials sold, a District manager informed FEMA auditors that up to thirty-five percent of the sale proceeds from each sale was attributable to materials collected during the 1995 and 1996 storms. Using the thirty-five percent figure, FEMA determined that it was entitled to a refund of thirty-five percent of the proceeds that the District received from each scrap material sale, reasoning that the proceeds earned by the District in selling scrap materials duplicated the aid that the District received from FEMA. 42 U.S.C. § 5155(c). The district court concluded that FEMA did not act in an arbitrary and capricious manner in relying on the District's own estimate that thirty-five percent of the materials sold as scrap were recovered during the 1995 and 1996 storms.
 
 
 42
 We agree. There is no basis to conclude that FEMA's determination in this regard was arbitrary and capricious.
 
 IV
 
 43
 In sum, there is no basis in law to support the District's contention that FEMA acted in an arbitrary and capricious manner when it conducted post-award audits of the District's federal disaster relief grants. In times of emergency and where disaster relief is needed urgently, FEMA should be permitted to act reasonably and consistently with applicable Federal laws and regulations in making a preliminary determination as to an applicant's eligibility for federal disaster relief. At the same time, FEMA should not be constrained by concerns that such preliminary calculations are subject to res judicata, or that FEMA is without authority to conduct an audit to ensure that its calculations are consistent with applicable Federal laws and regulations. Were we to accept the District's argument, we would needlessly hamper FEMA's goal that "eligible assistance be delivered as expeditiously as possible consistent with Federal laws and regulations." 44 C.F.R. § 206.200(b) (1996). This would be unacceptable and is not required by law. The agency's decisions that have been challenged, all of which relate to its audit process, are not arbitrary and capricious and do not conflict with the law. The agency's audit determinations and the district court's judgment upholding the agency show no legal error.
 
 
 44
 AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Michael D. Brown, Under Secretary of Emergency Preparedness and Response, Department of Homeland Security, is substituted for his predecessor, Joe M. Allbaugh, who served as Director of the Federal Emergency Management Agency. Fed. R.App. P. 43(c)(2)
 
 
 [1]
 The 1995 and 1996 versions of the Code of Federal Regulations were in effect at the times relevant to this litigation, and here we cite to the 1996 version. The regulations cited here had the same text for 1995 and 1996
 
 
 [2]
 At all times relevant to this litigation, the EMD was the state agency that coordinated FEMA's relief efforts with local entities such as the District
 
 
 [3]
 FEMA regulations said that the administrative process for the federal disaster aid was "closed out" when FEMA determined that "all applicable administrative actions and all required work of the grant ha[d] been completed." 44 C.F.R. § 13.50(a) (1996)
 
 
 [4]
 The District did not appeal FEMA's determination regarding over-stated equipment hours, and that issue is not before us
 
 
 [5]
 In agency appeal proceedings, FEMA reduced slightly its repayment demand due to a calculation error on FEMA's part
 
 
 [6]
 At oral argument, counsel for the District was asked whether there was a regulation in place regarding reimbursement of fringe benefit costs when the District applied for federal disaster relief. Counsel for the District replied:
 District Counsel: Yes. There are regulations in the OMB Circular A-87 that address the payment of fringe benefits and how that should work. I would submit to you—
 The Court: Did they change that regulation?
 District Counsel: They changed the way they were applying it.
 The Court: Did they change the regulation?
 District Counsel: No.
 
 
 [7]
 The District's reference to an internal FEMA memo recommending that the District be reimbursed for these costs is unpersuasive. There is no evidence to suggest that this was the official position of FEMA at any point